We'll hear the argument in the one case set for argument 18-3800-CR, which is United States of America versus Dean Jones. And Mr. Irving Cohen will begin the argument. I should... Yes, your honor. Let me, before you begin Mr. Cohen, let me just mention that we've adopted a practice earlier in the week that to give you as much of your time as possible without interruption. And then after you've concluded your remarks, I will turn to each of my colleagues on the bench and ask for any questions that they may have. And I will note for the record that, of course, I am Judge Cabranes, and I'm calling from New Haven, Connecticut. Judge Kearse is on the line and on the panel. She is calling from Fairfield County, Connecticut. And Judge Sack is calling from New York City. So go ahead, Mr. Cohen. Thank you. Thank you, your honor. First, I would say that I'm calling from Los Angeles, California, since my wife and I decided to stay here until this thing gets straightened out. Fortunately, the time of this morning was changed a little later, so I didn't have to get up at 5.30. I'm going to reserve my argument for point three, which involves the testimony of Stephen Christopher, the main witness at the trial, who, it turned out, just to briefly review the facts very quickly, he lied at the narcotics trial, and he had lied to the prosecutors. When he was questioned, he said he only smoked marijuana at the GEO facility. As it turned out, the truth came out much later, after the trial, that he actually had committed some serious crimes while there. He didn't just smoke marijuana. He bribed guards and smuggled in marijuana and K2. So not only did he commit those crimes, but he committed the crime of lying as well to the government, to whom he did not reveal the actual truth. So the importance of Christopher's crimes and lies. This is not the usual situation in which the defendant was convicted of all the charges, largely on the testimony of a cooperator, and where some additional impeachment evidence of the same sort comes to light later. This is very different for two reasons. First one is Jones was charged not only with the narcotics conspiracy, but with possession of a firearm and furtherance of it, and he was acquitted by the jury of that charge that solely relied upon his testimony. So in other words, the jury was ready to accept that Christopher could not be completely trusted. If they had heard the additional evidence, they likely would have gone all the way and rejected his testimony as well on the narcotics conspiracy count. That is particularly the case based on the nature of the newly revealed impeachment evidence. We're talking about serious crimes of drug smuggling and the bribery of jail guards and the crimes of lying to the very prosecutors with whom he was cooperating. If he could lie to prosecutors who had his future in their hands, he certainly would have no problem lying to the jury. So this is not merely some additional cumulative or additional basis of impeachment. These crimes and lies are an entirely different character, not simply some new past crimes that the jury was not made aware of that he withheld from them. These crimes and very prosecution at hand. While the case is being prosecuted, Christopher is committing crimes and then lying to the federal prosecutors who are actually handling the case. So it infects the entire process of the trial process in this case. It's not simply some additional impeachment that he may have committed some other crimes or whatever. These were lies to the prosecutor, and he then lied to the jury. So the jury, had they been made aware of these additional crimes during the very prosecution, had the brazen, those brazen lies during that time he was actually cooperating, had the jury been made aware of that, they would have likely rejected his testimony as respect to the narcotics count, just as they did with the firearms count. Now, there was some other testimony, besides Christopher's, allegedly connecting Mr. Jones to the crime. But these were highly untrustworthy witnesses. They were drug users, they used crack. They had very limited dealings with Mr. Jones. In fact, one of them particularly said that she didn't even name Mr. Jones when she was questioned on several, many occasions before, when she was asked to indicate all of the information she had about this drug activity between Vermont and New York. Another witness, Stanley, that witness's name was Kuntz, by the way. The other witness, Stanley, admitted that her memory is not clear. She was using crack. And so, and arguments were made that these witnesses just did not provide, certainly wouldn't provide on their own sufficient evidence that Mr. Jones was involved in this conspiracy. If the jury, the jury's acceptance of these witnesses was bolstered by Christopher's. In other words, when they heard it both together, they may have given more credence to what these two witnesses said. Because they, though they rejected Christopher's testimony with respect to the firearm charge, they didn't fully reject his testimony. That's what it seems likely that they did. Because they also heard testimony from these two witnesses. Acceptance of, without hearing this damaging testimony from Christopher about his lies and the crimes that he committed, they would have been much likely, the jury would have been much likely to accept the testimony of those two other witnesses. And so, even though, even without that, but even without that, the jury acquitted Mr. Jones of the weapons count. That's the, that's the argument I wish to make on it with respect to the narcotics charge, your honors. So, I'm open to any questions if your honors have any. Thanks very much, Mr. Cohen. Now, just an unrelated question. You're in Los Angeles by coincidence or? To be, my wife and I came here, we spent a couple of months here because our grandchildren are here. And the only granddaughter was actually February, just before things broke. So, we were staying here for a few weeks. Thank you. We were staying here another few weeks, but we decided that we could not come back to New York under the circumstances. We live in Manhattan in an apartment house and, and, and there was actually one case found in our apartment building. So, we're going to be here until we feel it's comfortable to come back. So, your address of record, just to be clarifical about it, is the one that we have which is in New York. Oh, yes, of course, of course. No, I've been working here and as well. So, doing the best that I can under the circumstances. Thank you very much. Sure. Ask my colleagues, Judge Keith, any questions? No questions here. Judge Sack? Yeah, just whether the information about Mr. Christopher and his crimes, it is not your position, or is it your position, that the government knew about it at the time but withheld that information from you? No, no, no, not at all. As a matter of fact, our position is that he lied to prosecutors, the very prosecutors who were, as I said before, had his fate in their hands. He had, he was so brazen that he had no problem lying to prosecutors under those circumstances. So, the jury would have, it would have been clear that he had withheld that information from the public. Is there going to be a separate argument as to the robbery offense? No, we're going to rely upon the arguments we made. In that case, let me ask you a second question. Sure. With respect to that, there's the FST evidence in the robbery trial. Now, my question is whether there's any binding precedent in our circuit or as to the, under Daubert, whether it's reliable under Daubert, FST evidence is? Well, that evidence was the only type of evidence with certain testing, as far as I understand, this complicated area in which the office of the medical examiner was the only office that really used that. And there were several reasons that we've indicated as to why it was not generally accepted in the scientific community. I'm asking about legal, judicial precedent that either, that resolves that question or not. We don't, I don't think there's any, at least we haven't found it. And if I apologize if there is, but I don't think we found any specific case that said this test is unreliable. It applies to the glove only where there was a mixed residue. It does not apply to the DNA evidence with respect to the hat. Is that correct? That's correct. There were two different aspects. One was mixed and one was supposedly not. And of course, you know, one of the big arguments here is that, you know, the items were left out in the rain for a couple of hours, degradation, degradation. But I'm concerned. I'm trying to focus on the FST. And I gather the FST test is applicable to the glove or gloves, but not to the, but not to the hat, which used other better settled DNA tests. Better settled, but still we argue not sufficient. On that score of Mr. Cohen. Sure. Yeah. The FST has been deemed admissible in state courts, right? Um, I believe so. Uh, I haven't done any further research on that, but as far as I know, there's no federal court that has, uh, has stated that, uh, unless I missed it, but, uh, that's, that's as far as I know. Is it, is it the case that, um, the federal standard is more flexible under Daubert than, than the, uh, test would be under state law? Do we know? Well, that's, well, I don't know. That's a good question. And I would have guessed it would also depend on which state we're talking about. Um, uh, but we focused on, obviously on federal K federal law, uh, uh, state law being simply persuasive on the issue, but, uh, I can't really answer that question accurately. I'm sorry. Okay. Well, this is, this is helpful. And thank you, Mr. Cohen. We'll, um, we'll hear now from Mr. McKay for the government, and maybe he has something to offer on this FST matter. Sure. Thank you. Thank you, Your Honor. May it please the court. My name is Thomas McKay. I'm an assistant United States attorney in the Southern district of New York. I represent the United States in this appeal as I did in the proceedings below. Um, I'll start where you left off with the DNA issue and then turn to the rule 33 issue. And of course, happy to answer any questions on any of the issues presented, um, with respect to the DNA issue, uh, judge Broderick correctly admitted the FST evidence after presiding over a very lengthy hearing at which you heard from several expert witnesses, his thorough opinion faithfully applied the Daubert standard. And on this record, he cannot be said to have abused his discretion. Uh, I believe it was judge Cabrera who asked whether, uh, other state courts had ruled on this issue. Uh, the answer is yes. The vast majority of state courts have admitted FST under the fry standard. Uh, this court's precedents, which are set in our brief state that the fry standard is in fact more rigorous than the Daubert standard and several state court of appeals decisions, which have been cited in our brief, uh, found that it was not an abuse of discretion, uh, to admit the FST in those cases. Uh, there is no federal binding precedent on this issue that we are aware of. Um, judge sack had asked a question about whether this testing applied to the glove only. Uh, the answer is yes. Uh, the FST was only used on the glove. It was not used on the hat. The type of testing that was done on the hat is not challenged on appeal. And I think that's important to emphasize on the harmlessness question because the FST evidence was relevant to the issue of Jones's identity. But even if you put the FST evidence to the side, the evidence of Jones's identity was overwhelming. The DNA evidence on the hat was a conclusive match to Jones. Uh, in addition, there was, uh, cell site evidence placing Jones at the scene of the robbery at the time of the robbery, and then showing him fleeing home afterwards. There was Jones's demonstrably false alibi about being in British court, Connecticut at the time of the robbery. And there was Jones's confession to a cooperating witness that he had committed the robbery. So even if you found that judge Broderick abused his discretion on the FST issue, though, of course we don't think he did, you would still, uh, affirm, you should still affirm on harmlessness. Um, I'd like to make just sort of two overarching points about the FST if, if I can, before I move on to the other issue, of course, answer any infallible. It simply requires the judge to act as a gatekeeper to ensure that the evidence is based on reliable principles and methods. But beyond that, the Dauber standard makes clear that juries can be entrusted to weigh scientific evidence aided by cross-examination. And that's exactly what happened here. Judge Broderick correctly decided that this evidence was sufficiently reliable to go to the jury. But of course, able defense counsel brought out, in cross-examination many, if not all of the issues or disputes about the probative value of the evidence that are being raised on appeal. The second overarching point is to remember that there was another gatekeeper even before judge Broderick, and that is the New York state DNA subcommittee, which is a blue ribbon panel of experts in the fields relevant to forensic DNA. Most, if not all of the criticisms made by Jones in his brief were explicitly considered addressed by the OCME in its dialogue with the subcommittee before the subcommittee, in fact, approved the testing. Moving to the rule 33 issue, similarly, judge Broderick did not abuse his discretion here. Again, he issued a detailed written opinion in which he reviewed the legions of impeachment material already available to the defense with respect to Steven Christopher, as well as the ample corroboration for Christopher's testimony. And he found that there was no reason to think that the additional information would have led to an acquittal. Judge Broderick, having presided over the trial, was of course, uniquely positioned to make that assessment. And this court should defer to that assessment. It's important to keep in mind the requisite standard here, which is that there was a justice or a real concern that an innocent person has been convicted. And time and again, in cases like Parks and the Jerice case, this court has found no abuse of discretion in declining to grant a new trial when there's additional cumulative impeachment material that comes to light. You know, here, as judge Broderick pointed out, there was vast impeachment material for Grand Jury, that he had likely breached his plea agreement by smoking marijuana in jail, that he had shot and likely killed four different people when he was 12 or 13 years old. And there was also ample corroboration for his testimony on the narcotics counts, like the testimony of Clemson Stanley, the bank records, the phone records, the traffic stop. This is all detailed pages 78 and 79 of the appendix, which is judge Broderick's opinion. And his oral argument, Mr. Cohen, I think pressed two reasons to think that this case is different from Parks or some of the other cases that have affirmed decisions on similar facts. But I don't think either is persuasive. The first is his attempts to read into the jury's verdict. And frankly, we think to the extent that the court is looking at the jury's verdict here for clues, it actually supports our position and not the defense's. Keep in mind the jury convicted on gun count. On the narcotics count, Christopher's testimony was well corroborated by evidence like Koontz's testimony, Stanley's testimony, the bank records, the phone records, etc. By contrast, on the gun count, the corroboration was more limited. Koontz and Stanley had not seen Jones with a gun and the things like the phone records and bank records weren't really probative of the gun count. And so the jury's split verdict acquitting on the gun count suggests that the jury did have some concerns about Christopher's testimony, and they were willing to credit it only insofar as you had ample corroboration as you did on the narcotics count. Second, Mr. Cohen talks about the nature of the revealed evidence, which is the suggestion that the same factors were at play in Parks and Juris. And I'm happy to review the facts of this case in more detail. But nevertheless, given the other impeachment material, given the corroboration, given the district court's unique position to determine whether a jury would have reached a different result, this court affirmed finding no abuse of discretion. So for those reasons, we think that the court should affirm. And of course, happy to answer whatever questions the Thank you very much, Mr. McKay. That's Judge Kears. Any questions? No questions here. Judge Sack? Yes. First of all, remind me on the Christopher evidence, when did that come to light with respect to the trial? It came to light after the verdict. At what point did it come to light? It came to light after the verdict in the narcotics trial. I think it was about a month after the verdict in the narcotics trial, but before the subsequent robbery trial. So all of this was the subject of cross-examination at the robbery trial. But because we didn't learn of this until a month after the narcotics trial, it was not mentioned. It wasn't available at that time. Okay. And as to the FST evidence, I understand your position, but from our point of view, I think we have not discussed the case amongst us. We don't as ordinarily, but I take it that in your view, your position is that we could either say, even if it's error, it's harmless error, and we should affirm in any event, or we say it was not error because FST evidence is clearly or is under the best scientific principles admissible under Daubert. Now, the difference to us would, should you prevail, is that if we did it on the basis of, if we were to decide this case on the basis of harmless error, if error was, then we are not creating any law in that regard. If we are the first court, first second circuit panel to rule or to have to rule and to rule on the admissibility FST evidence, what we say would become more important because then we are the precedent for its admissibility. And so I take it you are, you are pressing either one, or in any event, it is, it was admissible. Your Honor, a few responses to that. First of all, yes, we think you can resolve this case easily based on harmlessness, and then you don't have to set any precedent whatsoever. Of course, we think the best ruling would be to say that the FST was correctly admitted. I actually think that there's a third option, and that is to do exactly what this court did in the Morgan case that's cited in our brief, and say it was not an abuse of discretion to admit the evidence on the facts of this particular case, given the extensive record that Judge Broderick made. As you'll recall, the Morgan case involved another type of DNA testing that was uniquely used by the OCME, but was not widely used by other laboratories at the time. Judge Marrero had heard an evidentiary hearing about the reliability of that testing under Daubert and admitted it under Daubert. And this court said, look, this is not as well supported as other types of DNA testing. But nevertheless, on this record, it was not an abuse of discretion to admit the evidence. And we think the court could certainly do that here. I'd also point out that to the extent the court is thinking about sort of the far-reaching implications of the manner of its decision, I do think the impact of a ruling admitting FST on the merits or saying it was not an abuse of discretion actually would not have quite as sweeping implications as you might think. And that's because, keep in mind, beginning January 1, 2017, the OCME is no longer using FST. It's using a different, similar but different likelihood ratio program called STR-MIX. And there's no— So the precedential— I take it there's no legal consideration of that new test under Daubert, as far as you know. Are there other opinions opining on whether STR-MIX is— Whatever, yes. Yes. Not that I'm aware of in the Second Circuit, at least. I'm just curious. That's fine. Go ahead. There may be some district court opinions in other districts, but the Second Circuit, I don't think there's been a ruling on STR-MIX that I'm aware of. But again, STR-MIX is a different program with different—with certain modifications, which may mean that even if FST were admissible, STR-MIX would not be, or vice versa. Well, if it's not being used, then that might be—assuming we were to have the choice, and it was simply a choice, then it would make sense not to address the FST admissibility. It's not being used. As you say, it doesn't much matter. Well, I should add one caveat to that, Judge, which is that there are two circumstances in which the FST could come up again. The first is, obviously, there are some other pending cases in which the FST was admitted at trial, for which the decision in this case may have some presidential effect. In addition, there's a unique scenario in which the FST would still be used, which is, even though any evidence collected after January 1st, 2017 will be swabbed and if there was a piece of evidence that was collected in, let's say, December 2016, and then four years later, you know, a cold case investigation, if it can be called that, identified a suspect. Because of the difference in the amplification technology used between FST and STR-MIX, you might not be able to go back and take that evidence from 2016 and test it using the new technology. You might have to test it using FST. So, there is still some prospective potential use of FST, but that is decreasing as time goes on, and we don't expect it to be a particularly large number of cases. Thank you. This is Judge Cabranes. Let me ask you to follow up on Judge Sachs' concerns about FST. You mentioned the possibility of a harmless error disposition. Wouldn't that ordinarily suggest that there was error, though it is harmless? I mean, wouldn't that be, from your perspective, a less desirable result than the others that you have? Well, Your Honor, certainly our first preference would be for you to say there was no error. The FST is reliable under the Daubert standard. But this court commonly avoids merits questions by addressing harmlessness first and saying, we don't need to decide whether or not there was error in this case, because even assuming arguendo that it was, that error would have been harmless. If that was your ruling, I would think that any other case in which FST arises, we'd be working from a clean slate. We'd have the district court decision admitting FST, and we'd certainly say that that was correct, although defense counsel would be able to point out that the Second Circuit didn't see fit to opine on that. They avoided the question by addressing harmlessness. But I don't think that saying that it was harmless would undermine the district court's decision as long as your opinion was clear to say that you're not finding error. You're just avoiding the question by reaching harmlessness. Yes, that's interesting. Let me ask you a further question on FST. This was produced by, originally, I guess, by the Office of the Chief Medical Examiner in New York. Is that right? That's correct, Your Honor. And do we have some sense of whether DNA-related expert evidence produced by OCME, quite apart from the FST, do you know of any cases in which DNA-related expert evidence produced by the Office of the Chief Medical Examiner has been deemed inadmissible under Daubert in any federal court? I don't think so, Your Honor. No particular example is coming to mind in terms of excluding, under the Daubert standard, OCME's evidence in federal court. There may be, I have a vague memory that there's a decision out of the Western District of New York excluding a different type of DNA testing done by OCME. But as I recall, that was not under the Daubert standard. But it was because on the particular facts of that case, the testing was not done in conformity with the relevant protocols. But I'm not 100% certain that's that answer. And so please don't hold me to that. As I sit here, I don't know of a case in which OCME's evidence has been excluded under the Daubert standard. And going back to the question of whether after January 1, 2017, as you informed us, there's a new technique being deployed by the OCME, what about the state courts? Is this FST question still an ongoing source of litigation in the state courts, which might arguably be informed by opinions of the federal courts? Yes, Your Honor. The state of play in the state courts as far as I'm aware is as follows. The vast, vast majority of state trial courts have admitted FST under the FRI standard. And several appellate court decisions in New York State have said that the decision to admit the FST was not an abuse of discretion. There is one judge, one state trial judge who excluded FST under the FRI standard in a number of different cases, but it's the same judge applying the same cases. That was not tested on appeal and his decision has been uniformly rejected by the rest of the state trial. What jurisdiction? What jurisdiction? I believe that judge was originally in Brooklyn and then moved to Manhattan and so has issued opinions in both districts. The case is cited in the footnote in our brief. But in terms of the state of play going forward, I think it is similar to the state of play in federal court, which is to say that while there are some cases in the pipeline still involving FST, it is a diminishing number. And given the change in testing protocols, we wouldn't expect to see a great deal more cases involving FST going forward, although there is a possibility of some future. Okay. Thank you very much, Mr. McKay. Do my thank you. Okay. Now, Mr. Cohen, you didn't reserve time for rebuttal, but there have been an extended colloquy here on issues that you didn't touch on. If you want to take the opportunity to supplement your brief on these questions by taking a minute. Well, I think your honors are very familiar with the arguments on the FST. I just want to pull up something here on my computer. As I said before, I was concentrating my argument on the point three, having to do with the rule 33. And I strenuously disagree that this case is the same as these other cases in which additional impeachment evidence comes to light after the trial. Even if it turns out that the witness had previously lied on earlier occasions about other matters. And I think if you look at the difference between decisions, I don't have all of it in front of me, but compare the Stewart decision, for instance, with the Wallace decision, I think that you see that this is an entirely different situation where the additional evidence goes directly to the heart of whether this witness could be believed or not. Not just that, you know, instead of admitting, you know, 12 crimes, you find that he committed 13 or 14 crimes or something like that. And it's particularly interesting with respect to the fact that he lied to the government. So I just want to respond to that. And I think that it is, it is a different situation. It's an entirely different situation. Other than that, I have nothing further. Thanks very much, Mr. Cohen. And we are adjourned. Okay, everybody stay safe. Take care now. You too. All right.